we'll go on to the next case and that is appeal 23 1473 Jeffrey Johnson v. Hello everyone hope you're doing well and just want to wish you a Happy New Year which we did in the courtroom and Mr. Kerry you may begin whenever you're ready. Thank you your honor may it please the court my name is Raymond Kerry and I represent Mr. Jeffrey Johnson with respect to his appeal of his claims for retaliation and violation of section 42 USC 1981 as well as title 7 of the Civil Rights Act of 1964. Thank you for considering his appeal as well as the courtesy that you granted to me to appear remotely I'm not up to speed from a health standpoint although I'm okay and recovering I think anyway Mr. He explained to me that he was the. That determination of his employment back on November 15th of 2019 was the culmination of a pattern of retaliation against him by Accenture managers and human resource representatives. In violation of section 1981 as well as title 7. Because he made a good faith complaint on March 18th of 2019. To 1 of his managers as well as Accenture human resource representatives. About what he deemed have been his exposure to a hostile work environment based on his rates. Although the company concluded that there was no merit to his allegations of discrimination. There's no dispute that he engaged in protected activity when he made that. Complaint back in March of 2019. And I think if your honors review the record of this case in conjunction with. The absolute principles of law, and in particular, a decision of the court in Baines versus Walgreen company. Found it 863 fed 3rd, 656 7th circuit decision in 2017. As well as other profit precedent, you should conclude that. The district judge committed error and engaged in impermissible fact finding and credibility determinations. Rather than reviewing the circumstantial evidence in the record pertaining to Mr. Johnson's claims and determining that. It was sufficient for a reasonable fact finder defined. That he was the victim of retaliatory animus based on statements. Mr noble made about him to Accenture hiring representatives. I was just going to ask you, Mr. Kerry. What do you think? Mr noble should sit when Hancock asked him if Johnson was the person. Who walked off of the client a project. I'm sorry, did you say Mr. Hancock? Yes, in other words, what do you think? Mr noble should have said when Mr Hancock asked Mr noble if it was Johnson. Who had walked off the client a project. Well, I think what he should have told him is that he didn't walk off the project. That's not what happened. He made a complaint about the circumstances indicated his willingness to return to the project. After the conclusion of the investigation, regardless of the outcome, and I think if anything, he should have made a benign statement that he was a good person who he wanted to have continue on that project. But because of the complaint that he made, he was asked to temporarily leave the project until the complaint was investigated and concluded. Do we have anything in the record that explains what the procedure should be when someone has filed a complaint of discrimination? And then there is a inquiry from another part of the company. About, you know, is is noble in a position to disclose that Mr Johnson filed a complaint and that's why he left the. Left the project, you know, per company policy, you leave the project while the investigation is pending. Do we know how freely folks like noble and McQuinn. Are able to speak about the complaint that Mr Johnson filed. Well, I don't think he anybody needed to bring up the complaint, but from the standpoint of company policy, the testimony indicates that it is standard practice for someone to be removed temporarily from a project while they're investigating a complaint of discrimination. And the presumption is that once the complaint, or the investigation is concluded, there'll be restored. To the project, but there's policies that are in the record as well as Ms testimony that indicates that's the process and that's the process that Mr Johnson pursued. So, the issue really became. Mr noble's ambiguous statements about why and the timing of these about why Mr Johnson left the project, as opposed to providing positive references about him, regardless of the circumstances of his departure. Would have been more appropriate. The reasons why Mr Johnson left the project are not the critical issue. The fact that he was a good employee and noble had to know. That making statements of that nature that someone like Mr Johnson, in effect, walked off without cause that was basically a license for everybody not to retain them to the various projects, which was what occurred after the Dana project with the exception. Mr. Kerry, what is your best evidence? That Mr noble knew that Johnson had made a complaint about racial discrimination. Well, Mr Johnson's testimony that he told Mr noble. And Ms testimony that she told Mr noble. The complaint records itself that are in the record and Ms testimony that she told Mr noble the specifics of Mr Johnson's complaint as you do and an investigation. There is something in the background in 1 of your offices. Can we. Make sure that that goes away. Yeah, I don't think it's my office, but I'm looking to see if there's anything there's, there's nothing on my desk other than the computer that I'm in front of. There's a 4 there has been a voice. All right. Let's hope it. Has left now, of course, Mr noble did not give him. Any review at all, right? Mr. noble refused to provide an evaluation of any kind of Mr. Johnson, even though Mr. noble acknowledged during his deposition that Mr. Johnson was very effective at the work that he did on behalf of eccentric clients as an extension representative. I know that my time is running out. I believe I reserved 2 or 3 minutes. I don't worry about it. You'll get your rebuttal. Don't you worry. So, the bottom line is, but for Mr. noble's. Pattern of making false statements about why Mr. Johnson. Uh, we're basically false statements, indicating that Mr. Johnson had left the Dana project without cause and communicated that not only within the Dana project group, which included Mr. Hancock, but also that was communicated to Mr. Jane, which precluded Mr. Johnson from being retained for the cardinal project and Mr. Kerry, you mentioned Ms. Amick's testimony that there's a presumption that folks are reinstated after at the conclusion of an investigation. Is that is that merely are we to understand from our testimony? It's it's merely an unwitting written presumption. It's not a written policy anywhere. And it's not clear to me. Did Mr Johnson affirmatively asked to be reinstated to the Dana project? So, those are 2 questions there. I don't believe there's a specific written policy that indicates anything about reinstatement. The what what I'm relying upon is Mr. Johnson's testimony. That he told Ms. Amick as well as I think the person he initially contacted that he was willing to go back to the project. But that he was told while the investigation was pending not to return to the project. And then he had indicated to both Ms. Amick and I believe the other person that he was willing to be. Go back to the project after the investigation was concluded. But he was never given that opportunity. Instead, I believe it was either Ms. Amick, or it might have been a woman, Ms. Nancy Slickton, who had advised him to seek another project rather than return to Dana. But he did not voluntarily permanently leave the Dana project. He was never offered the opportunity to return after the investigation of his complaint. It can be pretty unusual for somebody to want to come back to a hostile environment. So, hostile. But could I ask you, Mr. Carey, to address what we do with the missing volume of plaintiff's deposition in the district court record? Well, I think, as I pointed out in the reply brief. I was unaware that that had not been included in the original appendix that was cited to that. But I believe with respect to the portions of the deposition that were missing, none of that testimony was contested. And I also don't believe that it pertains in any way to the analysis that was conducted by the district judge with respect to the retaliation claims. If you review the opinion, I think it begins at page 24. He analyzed the claims in conjunction with the facts that were asserted in support of Mr. Johnson's opposition to summary judgment with respect to the 1981 and Title VII retaliation claims. I might add, though, he had concluded, and I might add erroneously, that the Title VII claims were time-barred. But nevertheless, when you look at the analysis at the beginning of pages 24 of the opinion, he did purport to review the entire record as it related to the retaliation claims. Mr. Carey, I'm going to give you the entire record, but obviously the district judge was troubled by the idea that you had cited a lot of testimony that was not actually in the record before him. Right. And I believe in follow-up supplemental statements that were submitted on behalf of Accenture, I believe those facts that the judge raised concerns about were not contested. Okay. We'll ask. Well, I think the problem is that the deposition record was never part of the record below, and yet it was included as a new Appendix A in a manner that made it look like it was the original Appendix A that had been attached to the Rule 56 statement. I'm not sure I understand your question, Your Honor. It was really more of a statement than a question. Look, on appeal, you included in the record the Rule 56 statement from the district court with a new Appendix A attached. That now does include the first day of the deposition, which was taken on March 17th, 2022. And it was labeled pages 1 through to 11. And that deposition record was never part of the record below, and yet it is included in our court in a new Appendix A in a manner that make it look at least to me like it was the original Appendix A attached to the Rule 56 statement. And it was not. And I think that is what Judge Hamilton was asking you about. Am I incorrect, Judge Hamilton? That is a more precise way of making the point. My assistant, I think, who put the appendix together, both I think at the district court level and at the Seventh Circuit level, compiled those things in my understanding and I said . . . Blaming your assistant. This is your responsibility. And I take responsibility for that. But I'm trying to explain what happened based on my ability to investigate and find out what happened. But I think she had inadvertently substituted the wrong deposition. I think day two rather than day one of the deposition in the district court record and apparently sought to correct that in the court of appeals record. But my understanding was also that Accenture had relied on Mr. Johnson's first day deposition and I think she had assumed that that was already in the record at the district court level as well. Okay. Unless anyone would like to ask anything more of Mr. Kerry, we're going to . . . We will give you your two-minute rebuttal that you had asked for, but we are going to go on to Mr. Roche. Hello, Mr. Roche. Good morning, Your Honors. May it please the court. I'm Michael Roche and I represent Appellee Accenture. This is a case about an employee, Mr. Johnson, who was terminated for completely legitimate, objective, non-retaliatory reasons. He was terminated for objective reasons that were applied equally to more than 100 other Accenture employees that year. Further, the decision-maker who decided to terminate Mr. Johnson had no knowledge of any purported protected activity by Mr. Johnson. These facts are in the record and undisputed and that's essentially why Judge Shaw issued a very thorough and well-reasoned 31-page opinion granting summary judgment to Accenture and we think that opinion should be affirmed. Do you think that Mr. Noble had an obligation to say more to Hancock when he asked if Johnson was the same employee who walked off the client aid project, something like, well, yes, but he was concerned about an unhealthy environment or something in that, you know, tone? No, I don't think he had any such obligation, Your Honor. Not only do I think he was not obligated to do that, I think it could have been very troubling if he did do it. Mr. Noble, we can see Mr. Noble did hear about the complaints eventually because he was asked about them in the investigation. He was a witness and so naturally he had to be asked about them. But people are told at Accenture and I think in most companies to not repeat that sort of information. It could have been more damaging to Mr. Johnson's career or at least there's a concern or fear that it could be. But what about Mr. Kerry's perspective here that, okay, Noble didn't have to reveal that there was a pending complaint, but he could have said something far more innocuous or potentially accurate along the lines of his deposition. And using the language so he could have commented on his abilities as an employee, but using the terms walked off is a mischaracterization of what has happened when somebody leaves a project because they filed a complaint of discrimination. So he could have said something other than walked off and could have said something like he was, as language even that McQuinn proposes later, extenuating circumstances. Or he was an effective employee, he's no longer with the project for reasons I can't disclose. Or he was an effective employee, full stop. Or so forth, so on. But it doesn't have to be, the problem with walked off as it suggests Mr. Johnson, a jury could reasonably determine, is someone who doesn't follow company policy. When in fact Mr. Johnson was following company policy when he left his project subject to an investigation. We are just doing a couple of things. All Mr. Noble wrote was the word yes. Now you're right, he was responding to a question where I said, is this the person who walked off? He accepted the premise of the question. Correct, correct. And he answered yes. I'll also note that while it is an immaterial fact, there is a dispute of fact as to whether Mr. Johnson was told he could not rejoin the project. Now we think it's immaterial and I can explain why. But the Accenture folks and Mr. Noble would say he did not know, certainly did not believe, and this goes to his state of mind, he did not believe that Mr. Johnson was told he could not return to the project. His belief was Mr. Johnson had asked to be removed from the project and did so. And the record shows an email from Mr. Johnson to him, which indicates that. It's not a completely straightforward statement, but it certainly indicates a person who wants to and is planning to leave the project. So Mr. Noble's state of mind, which is at issue here, if he's the retaliator, then it's his state of mind that's at issue. In his state of mind, Mr. Johnson did in fact choose to leave the project and wanted to leave the project. And so I think what Mr. Noble would agree to and said in his death, was he annoyed that Mr. Johnson left this sort of very busy project in the middle? Yes. That's different than having a retaliatory animus and wanting to retaliate against him for raising discrimination. She said that was not at all what he did. So he did answer yes to the question of whether he walked off the project. In an email in the middle of a workday, he answered the word yes. I suppose in hindsight, as lawyers, we'd all love to sit down and write perfect emails for him to write. But in the middle of a workday, when he got that email question, he wrote the word yes. And I don't think there was any legal obligation for him to say anything more. And that reflected his state of mind and his knowledge at that moment, which was not based on retaliatory animus in any way. I'll also note that the appellant's brief met states without support that Mr. Noble made similar comments to others and the like. There's nothing in the record to support that other than Mr. Noble stated that when anyone, you know, first of all, he received one other email asking about it. He did not reply. And when others asked about it, he did not say anything about Mr. Johnson walking off the project. So it's pure speculation with no support at all to say that he had a, quote, pattern of making these statements, I think was just said in the argument, or a pattern of making false statements. There were no false statements and there was no pattern. There is an email with the word yes in response to asking whether Mr. Johnson had walked off the project. And moreover. Oh, I'm sorry. No, go ahead. I'm sorry. No, he's finished. I was just going to say, you know, moreover, even if Mr. Noble's comment was inappropriate, I don't think it was, but assuming for the sake of argument it was, the break in the chain of causation here between that and Mr. Johnson's termination is immense. That was to just be said, that was not about hiring or termination. That was about being staffed on another project. The person who chose the new employee for that project stated in the record that the reason he chose another person was because that other person had a preexisting relationship with the client. Cargill was already working for Cargill, new people there. And that's why he chose the other person. So we have the decision maker in the record stating that there was nothing about Noble's comment that affected the decision. We also have that same decision makers very high on Johnson until the moment he learns that Johnson learns that others had a negative view of Johnson's performance, which flows directly from Johnson leaving the Dana project. So if we zoom out, I'm concerned about the view the jury might have if we zoom out. You know, Johnson's terminated because he sits on the bench too long. He sits on the bench too long because he hasn't had any new projects. For at least two of those potential projects, he hasn't had them because of a negative inference that flows from him leaving the Dana project. He's perceived as walking off, quote unquote, the Dana project. And then that is what is communicated to the Cargill people. That does influence his ability to get those two projects. And those are two of the absence absences that are the absence of work that ultimately lead to termination. Why is it, in your view, a reasonable jury can't see a pattern that way? Well, because, Your Honor, even if that were a pattern, and I disagree that there's causation between Dana and Cargill, but even if there were, the Cargill project is in April and the termination is in November. So, after that time, he still applies for other projects and he's chosen for other projects. So, if there is this pattern of trying to prevent him from getting projects, they're doing a pretty bad job of it. He is chosen for additional projects during that time. And in July, he's chosen for a very significant project for Johnson and Johnson. And people on that project, and there's nothing in the record indicating they have any connection with the people from the earlier projects, no connection with Mr. Noble or Mr. Hancock, none whatsoever. And they bring him onto that project and within eight days, they conclude his performance is bad and they remove him from the project. And there's nothing in the record whatsoever connecting those people to Mr. Noble or anyone else on those earlier projects or any communications from Mr. Noble or anything else. And even if there were a chain of causation up until July, I don't think there was, but for the sake of argument, that would really cut it off. He has the opportunity then, he's given the opportunity and no connection at all to prior comments and he ends up being taken off that project because of performance. The company, each one of these stages, the company bends over backwards to give him additional time. The company has a general policy about only eight weeks without a client project. He exceeds that repeatedly and the company bends over backwards more than they do for any other employee. And he could not point to a single comparable employee who was on the bench as long as him who did not get terminated. They all got terminated if they were on as long as him. He gets yet another project in August and works on that. So again, even if there were, for the sake of argument, some sort of causation between Dana and Cargill, it is broken by these later events and those people have no connection at all to the alleged retaliators from the earlier project. And so there's simply just no chain of causation. And I'll note the Walgreens case mentioned by plaintiff's counsel that he relies on heavily in his brief. That does not stand for what plaintiff says it does. Plaintiff wants to rely on purely circumstantial, not even circumstantial speculation and argue that, boy, Mr. Noble must be lying. We think he's lying. A jury should hear our supposition that he's lying. The Walgreens case does not approve that. In Walgreens, there was an actual testimony from a witness under oath stating that they heard the person like Mr. Noble in that case, admitting that they lied and told a lie about the employment decision. It was actual sworn testimony in the record by a witness with knowledge stating that the retaliator had lied about the employment. There was nothing like that in this case. There was nothing in the record whatsoever. And a party can't avoid summary judgment simply by saying, I bet somebody's lying. I mean, if that becomes the standard, then no case could ever win summary judgment. There has to be some support for that notion. And there is no support in the record here. Could I follow up just on one brief point with the indulgence of my colleagues? And that is, with this missing volume of the plaintiff's deposition from the record, Mr. Roche, what is there that matters? What difference does that make in the handling of the record, as sloppy as it may have been here? Right, Your Honor. And I will note on that point that there was a statement, I think, in the brief that Accenture had said it had attached the full transcript below. That's simply not right. If you look at our filings, it says very clearly the cited portions of the transcript are attached. At no point did we ever represent that the entire transcript was attached, and that doesn't appear anywhere in the briefs. There are some specific facts that appeared in the appellant's brief that we note should be disregarded, either because of the missing transcript or because Judge Shaw very properly decided to disregard those facts. And they're on page 10 to 11 of our brief. We have a bullet point list where we list out the facts from the appellant brief that should be disregarded on that basis. Thank you. I see I'm out of time, so I'd be happy to answer any further questions. Hearing none, thank you very much. And, Mr. Perry, we're going to give you the two minutes that you requested. Yeah, and I'll be brief. With respect to the two projects that Mr. Roach referred to, Johnson & Johnson, and I believe it's Tenneco, the record reveals or discloses that Mr. Johnson got those on his own, not with the assistance of HR representatives, Ms. Quiroz or Ms. McQuinn, who basically covered up the rescission of his selection for the Cargill project. With respect to the Cargill project, and I think Mr. Roach was alluding to the declaration from Mr. Jane, Mr. Jane's declaration is contradicted by his email exchange concerning the Cargill project, where he specifically requested, after he received the information from Mr. Hancock about Mr. Noble's statement, he specifically indicated in that email exchange that Mr. Johnson was not a good fit and he needed to consider other candidates and requested that Ms. Quiroz provide those to him. Mr. Kerry, after you conclude your two points, I think you're at the conclusion, can you address Mr. Roach's point that even if there were any kind of chain between Dana and Cargill, that chain of retaliation was broken by the subsequent projects that Mr. Johnson was able to get, you know, between April and then the termination in November? Well, the second project was the one that was between July and August. That would have been the Teneco project after the J&J project. And the Teneco project, Mr. Johnson succeeded at, and they ended that project successfully in shorter time than necessary, which prompted him to go back on the bench. But what Mr. Roach didn't point out is that, in addition, Mr. Noble and the others, Mr. Hancock, Mr. Carla, and I believe it's Mr. Rowe, also had issued some sort of report permanently disqualifying Mr. Johnson from Accenture Midwest SAP projects. And that permanent disqualification negatively impacted his ability to get any projects after he successfully completed the Teneco project. Where do we find that? That, pardon me? Where do we find the evidence about such a report? That's at the, in the appendix, it's pages 530, 533, 536, 556 to 559, 639 to 642, and Exhibit N, which is what's labeled as disqualification emails. Those are exchanges among Mr. Noble, Mr. Hancock, Mr. Carla, and Mr. Rowe, I believe it is, indicating that they had permanently disqualified Mr. Johnson from Accenture projects. And those emails, I believe, were disseminated in August of 2019. And as of that time, Mr. Johnson was not selected for any projects after successfully completing and being lauded for the successful completion of the Teneco project. So, with that said, I respectfully request on Mr. Johnson's behalf that the court reverse the district court's decision and remand this case back to the court for a trial. And I thank you for your time and attention. Thank you both very, very much, and the case will be taken under advisement.